UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | |
|---|---|
| TRUSTEES OF THE INDIANA STATE COUNCIL OF ROOFERS HEALTH AND WELFARE FUND, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 4:07-CV-16 JD ) |
| EMBRY'S ROOFING INC., | ) ) |
| Defendants. | ) |

OPINION AND ORDER

On March 7, 2007, Plaintiff, Trustees of the Indiana State Council of Roofers Health and Welfare Fund ("Trustees"), filed a Complaint in this Court. On July 31, 2007, Clerk's entry of default was entered against Defendant, Embry's Roofing Inc. ("Embry's"). On February 27, 2009, this Court granted the Trustees' motion for default judgment.

On February 26, 2010, Embry's filed a motion to set aside default judgment, pursuant to Fed. R. Civ. P. 60(b)(1). On April 2, 2010 the Trustees filed a response in opposition. On April 12, 2010, Embry's filed a reply. On June 3, 2010, this case was reassigned to the undersigned for all purposes.

**I. Facts**

Embry's is a roof installation company based in Newburgh, Indiana, performing both commercial and residential work. (Robert Embry Decl., DE 30-1 at 1-2). Embry's is owned and operated by a husband and wife team, Robert and Michelle Embry. (Robert Embry Decl., DE 30-1 at 1). In 2007, Embry's employed between twelve and sixteen employees. (Robert Embry

1

Decl., DE 30-1 at 2). At that time, these employees were represented by the Tri-State Roofing and Waterproofing Contractors Association ("Union"), which was governed by an April 1, 2004 Collective Bargaining Agreement ("CBA"). (Robert Embry Decl., DE 30-1 at 2).

Pursuant to the CBA, Embry's was required to contribute specified dollar amounts for "each hour worked by each employee covered by the agreement." *See* DE 42 at 3. In his sworn affidavit, Robert Embry asserts that the agreement required only contributions for commercial work performed. (Robert Embry Decl., DE 30-1 at 2-3 and Union Letter, DE 30-2). The Trustees dispute that claim, referencing Article XIV of the agreement and the Affidavit of Ellen Densborn, the Fund Administrator. *See* DE 21-3. Contributions were directed to two funds, the National Roofing Industry Pension Fund ("Pension Fund") and Benefit Administrators, Inc. ("Health and Welfare Fund"), the latter of which was administered by the Plaintiff Trustees. (Robert Embry Decl., DE 30-1 at 2). At least as to the Health and Welfare Fund, the Trustees argue that the union representative who indicates contributions were limited to commercial work was not an agent of the Health and Welfare Fund. *See* Trustees' Brief, DE 42 at 2-3. Moreover, Embry's has provided no substantive evidence affirmatively establishing that the prior agreement with the Union was specifically applicable to the Health and Welfare Fund. *See* Union Letter, DE 30-2 (the letter is silent in regards to application of the prior agreement).

On March 7, 2007, the Trustees filed this suit against Embry's, pursuant to Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, and Section 502 of the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132. [DE 1]. In the complaint, the Trustees allege that Embry's failed to make timely payments to the Health and

2

Welfare Fund as required by the CBA. [DE 1]. On March 16, 2007, Embry's was served with the Complaint. [DE 3].

On April 4, 2007, counsel for the Trustees, Charles L. Berger, sent Robert Embry a letter, delineating the specific amounts owed to the Health and Welfare Fund and stating that "[i]f you make the payments owed for January and February with late fees and the funds set out in this letter, we will then dismiss the case." (Trustees' Letter, DE 30-1 at 7) (requesting, in addition to payments for the months of January and February, $666.88 in late fees, $350.00 for filing fee and $750.00 in attorney fees). On April 20, 2007, Embry's paid the attorney fees and filing fees, the initial payment returned for insufficient funds, but disregarded the letter's request for payment of the amounts owed for January and February.[1] (Robert Embry Decl., DE 30-1 at 3; Embry's Checks, DE 30-1 at 8). Despite the partial payment, Robert Embry asserts that he believed that Embry's had successfully resolved this lawsuit. (Robert Embry Decl., DE 30-1 at 3). Although Robert Embry was not represented by counsel at the time of payment, (Robert Embry Decl., DE 30-1 at 3), the pleadings demonstrate that he was not unsophisticated, having owned and operated the roofing business for over ten years and therefore familiar with the intricacies of both the Health and Welfare Fund and the Pension Fund. (Robert Embry Decl., DE 30-1 at 1).

On July 30, 2007, the Trustees served upon Robert Embry a motion for a Clerks' entry of default, due to Embry's failure to respond to the Trustees' complaint. *See* DE 6. Embry's filed no response. The motion was granted the next day. *See* DE 7.

---

[1] However, this Court notes a minor discrepancy of twenty cents between the amount alleged paid by Embry's and the amount asserted as owed for fees in the Trustees' letter.

Thereafter, in early 2008, the Pension Fund**,** a separate fund from the Health and Welfare Fund**,** conducted an audit and determined that Embry's owed $339,985.17 in back contributions and damages to the Pension Fund. (Robert Embry Decl., DE 30-1 at 3). Embry's disputed the results of the Pension Fund's audit, claiming that the audit incorrectly included time worked by Embry's employees on residential projects. (Robert Embry Decl., DE 30-1 at 3-4).

As a result of the dispute, on August 25, 2008, the Pension Fund brought a separate suit against Embry's pursuant to Sections 502 and 515 of ERISA, 29 U.S.C. §§ 1132 and 1145. (Robert Embry Decl., DE 30-1 at 3-4). *See also Martini v. Embry's Roofing Inc.*, 2:08-cv-240 (N.D. Ind. Aug. 25, 2008). In that case, the Pension Fund similarly contended that Embry's had not paid contributions to the Pension Fund, as mandated by an existing CBA. *See Martini v. Embry's Roofing Inc.*, 2:08-cv-240 (N.D. Ind. Aug. 25, 2008). On September 10, 2008, Embry's and Robert Embry were served with the Pension Fund's Complaint. *See Martini v. Embry's Roofing Inc.*, 2:08-cv-240 (N.D. Ind. Jan. 13, 2009). On January 13, 2009, the Pension Fund filed a motion for Clerk's entry of default. *See Martini v. Embry's Roofing Inc.*, 2:08-cv-240 (N.D. Ind. Jan. 13, 2009). On October 16, 2009, the Pension Fund filed a motion for default judgment. *See Martini v. Embry's Roofing Inc.,* 2:08-cv-240 (N.D. Ind. Oct. 16, 2009). Ultimately, on November 6, 2009, the Pension Fund's suit resulted in a default judgment**,** as Embry's failed to respond to either the Pension Fund's complaint or motions. *See Martini v. Embry's Roofing Inc.*, 2:08-cv-240 (N.D. Ind. Nov. 6, 2009).

Back to the instant case, on February 16, 2009, having secured a Clerk's entry of default on July 31, 2007, the Trustees moved for default judgment against Embry's in the amount of $362,216.55, plus attorney fees and costs, consistent with the affidavit of the fund administrator.

4

[DE 21]. On February 27, 2009, the Court granted the Trustees' motion for default judgment, noting that Embry's had "failed to enter an appearance in this case or respond to Plaintiff's Complaint in any way." [DE 22 at 2].

In mid-2009, the Pension Fund verified that the audit mistakenly included hours for residential work. (Robert Embry Decl., DE 30-1 at 4). Thereafter, Embry's asserts that it negotiated a resolution to the Pension Fund's lawsuit by agreeing to pay $56,391.48, plus costs and fees. (Robert Embry Decl., DE 30-1 at 4; Pension Fund Letter, DE 30-1 at 10). In truth, however, the Pension Fund letter dated September 24, 2009 demonstrates that there was no resolution, only an apparent agreement as to the amount owed to the Pension Fund. (Pension Fund Letter, DE 30-1 at 10). Robert Embry also asserts that during negotiations counsel for the Pension Fund mentioned that he had spoken with counsel for the Health and Welfare Fund to discuss the results of the Pension Fund's audit. (Robert Embry Decl., DE 30-1 at 4). As such, despite the fact that Robert Embry was fully aware that there existed separate counsel for each fund and two separate lawsuits, he asserts that he thought the suits were one-in-the-same and believed that the discussions with the Pension Fund were meant to resolve both claims. (Robert Embry Decl., DE 30-1 at 4).

Again, however, the facts demonstrate that there was no negotiated resolution to the Pension Fund case, as default judgment was ultimately entered in that case using the corrected figures. *See Martini v. Embry's Roofing Inc.*, 2:08-cv-240 (N.D. Ind. Nov. 6, 2009)**.** Moreover, Embry's fails to explain how the agreed, but still unpaid amount of $56,391.48, might satisfy both fund amounts due and resolve the underlying lawsuits, especially when the letter of September 24, 2009 clearly and repeatedly states that the amount owed was for the Pension Fund

5

alone. *See* Pension Fund Letter, DE 30-1 at 10. Almost one year after entry of the default judgment in this case, Robert Embry alleges he received notification from his bank that the Health and Welfare Fund was seeking information regarding Embry's account in order to collect on the default judgment. (Robert Embry Decl., DE 30-1 at 5). Robert Embry asserts that this notification prompted his seeking of legal counsel and the filing of Embry's immediate motion to set aside the default judgment. (Embry's Reply, DE 43 at 4).

## II. Defendants' Motion to Set Aside. [DE 29]

### A. Applicable Law

Fed. Rule of Civ. P. 55(c) states, "[t]he court may set aside an entry of default for good cause, and it may set aside a default judgment under Rule 60(b)." Fed. R. Civ. P. 60(b)(1) permits a court to set aside a default judgment on account of mistake, inadvertence, surprise, or excusable neglect. Fed. R. Civ. P. 60(b)(1). Relief under Fed. R. Civ. P. 60(b) is an "extraordinary remedy and is granted in only exceptional circumstances." *McKnight v. U.S. Steel Corp.*, 726 F.2d 333, 335 (7th Cir. 1984); *C.K.S. Engineers, Inc. v. White Mountain Gypsum Co.*, 726 F.2d 1202, 1204-1205 (7th Cir. 1984); *Tate v. Riverboat Servs., Inc.*, 305 F.Supp.2d 916, 919 (N.D.Ind. 2004).

Nevertheless, it is within the sound discretion of this Court to determine whether to set aside a default judgment. *McKnight*, 726 F.2d at 335; *C.K.S. Engineers, Inc*, 726 F.2d at 1205. *See also* 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2693 (3d ed. 2010). Courts in this Circuit have found it appropriate that Rule 60(b)(1) be liberally applied, especially where default judgment is the result of an honest mistake rather than willful misconduct, carelessness or negligence. *Id*. *See also A.F.*

*Dormeyer Co.*, 461 F.2d at 42; *Tate*, 305 F.Supp.2d at 919 ("[D]efault judgments should generally be set aside where the moving party acts with reasonable promptness, alleges a meritorious defense to the action, and where the default has not been willful."). Nevertheless, "where a defaulting party was aware of or should have been aware of its responsibilities to the opposing party and to the court, and failed to live up to those responsibilities through unexcused carelessness or negligence, the default judgment has been left intact." *C.K.S. Engineers, Inc.*, 726 F.2d at 1206.

## B. Analysis

In determining whether to set aside a default judgment, the Seventh Circuit has developed a three part test. *See Pretzel & Stouffer v. Imperial Adjusters*, 28 F.3d 42, 45 (7th Cir. 1994); *U.S. v. Dimucci*, 879 F.2d 1488, 1495 (7th Cir. 1989); *Tate*, 305 F.Supp.2d at 919. To satisfy the test, Embry's must show: (1) good cause for default, (2) quick action to correct the default; and (3) the existence of a meritorious defense to the original complaint. *Id.* Underlying this Court's inquiry is whether Embry's action, or lack of action, was willful. *C.K.S. Engineers, Inc.*, 726 F.2d at 1205-1206; *see also* 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2693 (3d ed. 2010); *see e.g. Tate*, 305 F.Supp.2d at 922-23.

> In a case where the defendant has a reasonable explanation for its conduct that excludes any possibility of willfulness, and the defendant has an obviously meritorious defense to the plaintiff's claim, the interests of justice-of allowing a trial on the merits to proceed to a judgment that is fair and based on a full presentation of the evidence-demand that a default judgment be vacated and the case allowed to proceed to trial.

*Passarella v. Hilton Int'l Co.*, 810 F.2d 674, 678 (7th Cir. 1987).

*1. Good Cause for Default*

Fed. R. Civ. P. 60(b)(1) denotes that good cause can consist of "mistake, inadvertence, surprise, or excusable neglect." Fed. R. Civ. P. 60(b)(1); *Tate*, 305 F.Supp.2d at 919. In the immediate case, Embry's alleges that both mistake and excusable neglect justify setting aside the default judgment against it. For the reasons stated below, this Court concludes that Embry's has failed to show good cause to set aside the default judgment.

      a. Mistake

Embry's asserts that its inaction in this case was due to a mistaken understanding that the case had been successfully resolved. Relief under Fed. R. Civ. P. 60(b) is intended to address mistakes attributable to special circumstances and not merely to erroneous applications of law. *Russell v. Delco Remy Div. of Gen. Motors Corp.*, 51 F.3d 746, 749 (7th Cir. 1995). Embry's notes that it was without legal counsel throughout the entire course of its litigation with the Trustees. As such, Robert Embry declares that he lacked sufficient understanding of the legal procedures of litigation, especially in regards to the resolution of the Trustees' case. In support, Robert Embry argues two events caused him to mistakenly believe that the Trustees' case had been successfully resolved.

First, Robert Embry points to the letter that was sent to him by the Trustees' counsel, on April 4, 2007. He asserts that the letter indicated that, should Embry's make payment to the Health and Welfare Fund according to the terms of the letter, the Trustees would then dismiss its lawsuit. (Trustees' Letter, DE 30-1 at 7). Robert Embry contends that he made payment as delineated in the letter on April 20, 2007; and, as a result, he believed that he had successfully

resolved the Trustees' suit against Embry's. (Robert Embry Decl., DE 30-1 at 3; Embry's Checks, DE 30-1 at 8).

Clearly, Robert Embry did not make payment as delineated in the letter. He failed to make any payment for the January and February payments owed, including late fees. As such, it is difficult to understand how Embry's might have reasonably and in good faith believed that the partial payment would result in dismissal of the suit when it did not satisfy all of the express terms of the letter. (Densborn Aff., DE 42-6 at 1-2). Moreover, the Trustees point out that Robert Embry failed to submit reports of employee hours for January and February of 2007 as additionally required by the letter. (Densborn Aff., DE 42-6 at 2). *See also* Trustees' Letter, DE 30-1 at 7.

Even to an unrepresented Defendant such as Robert Embry, the language of the Trustees' letter was clear and unambiguous in relation to what Embry's must do to warrant dismissal of the Trustees' suit. Moreover, Robert Embry was not unfamiliar with the conditions and payments surrounding the respective funds. He has operated the roofing company for over ten years and has been responsible for making these payments.

Specifically, the letter required that Embry's *both* pay the amounts delineated in the Trustees' letter *and* contact the Fund to determine the amounts owed for January and February of 2007. The letter states,

> [w]e would also like to again stress that your company is late for January and February and owes additional late fees for same. I would recommend that you contact the Fund Office immediately to determine the amount owed for January based upon your contribution reporting form that should be sent to them immediately.

9

*See* Trustees' Letter, DE 30-1 at 7. The letter further indicates that only after both payments were made would dismissal be warranted. *Id.* ("If you make the payments owed for January and February with late fees *and* the funds set out in this letter, we will dismiss the case.")(emphasis added).

Embry's fails to explain, either in its response brief or in Robert Embry's affidavit, why Robert Embry did not make the additional payments for the January and February contributions required in the letter. In addition, Embry's does not argue that Robert Embry either failed to notice the letter's additional requirement or mistakenly interpreted it to be inapplicable. Given the clarity of the letter's terms, Robert Embry's familiarity with the Health and Welfare Fund and the Pension Fund, and Embry's failure to plausibly argue any mistaken interpretation, this Court concludes that Embry's did not act out of mistake.

Second, Robert Embry points to his alleged "settlement negotiations" with the Pension Fund in mid-2009 as another source of his mistaken belief that the Trustees' Health and Welfare Fund lawsuit had been resolved. Specifically, Robert Embry asserts that two years after he made partial payment to the Trustees relative to the Health and Welfare Fund, and shortly after a dispute arose regarding amounts due under the Pension Fund, *see Martini v. Embry's Roofing Inc.*, 2:08-cv-240, he became aware that the Trustees were seeking a judgment against Embry's in an amount similar to the amount claimed in the Pension Fund audit. (Robert Embry Decl., DE 30-1 at 4). Due to the similarities in the amounts demanded, Robert Embry contends that he mistakenly believed the lawsuits to be one-in-the-same. (*Id.*). Further, Robert Embry declares that he resolved the Pension Fund's lawsuit; which he**,** in turn**,** believed settled any outstanding disputes with the Trustees. (*Id.*).

Simply, Embry's assertions in this regard are incredulous. In its motion, Embry's indicates that a settlement agreement was ultimately reached between Embry's Roofing and the Pension Fund. *See* Embry's Motion Brief, DE 30 at 8. Similarly, in his declaration, Robert Embry asserts that he and the Pension Fund "negotiated a resolution" and that "upon conclusion of the negotiations" Embry's agreed to pay the Pension Fund a particular sum certain. *See* Robert Embry Decl., DE 30-1 at 4. However, a review of the docket in the Pension Fund case, *Martini v. Embry's Roofing Inc.*, 2:08-cv-240 (N.D. Ind. Oct. 16, 2009), reveals that, contrary to Embry's assertions, a settlement agreement was not reached by the parties. Instead, the docket evidences that the Pension Fund was ultimately granted default judgment against Embry's on November 6, 2009, a few months after "settlement negotiations" were allegedly conducted. *See Martini v. Embry's Roofing Inc.*, 2:08-cv-240 (N.D.Ind Nov. 16, 2009). Further, the letter Embry's cites as evidence that an agreement was reached with the Pension Fund to settle that suit is merely an inquiry regarding the actual amount owed and requests that Robert Embry contact the Pension Fund to discuss payment. (Pension Fund Letter, DE 30-1 at 10). Clearly, the letter says nothing about Embry's suit with the Trustees or payments owed to the Health and Welfare Fund. (*Id.*).

Given this stark difference between Embry's representation of the facts on the one hand and this Court's docket and the plain language of the Pension letter on the other, this Court must conclude that Embry's assertion raises serious doubt.

Also indicative of the absence of mistake is the record in this case. Numerous motions and orders were served on Embry's in relation to this case, shortly before settlement negotiations allegedly began between Embry's and the Pension Fund. Specifically, the Trustees note that,

11

between April 2008 and March 2009, Embry's received service of at least three documents: this Court's order setting a status conference, DE 13; a motion to compel filed by the Trustees, DE 15; and the Trustees motion for default judgment, DE 21. As such, Embry's was very much aware that this case had been resolved in the Trustees' favor pursuant to a default judgment at the time Robert Embry suggests he was in settlement negotiations with the Pension Fund.

Embry's made no attempt to rebut the Trustees' arguments regarding notice of ongoing action in this case, including the argument that Embry's was aware that this Court entered default judgment against it in February 2009. Moreover, Robert Embry undermines his claimed ignorance regarding the status of this suit by implicitly acknowledging that he was aware of the Trustees' ongoing actions in this case. Specifically, in his declaration, Robert Embry states that in December 2008 he "became aware that the [Trustees were] demanding a $340,000 judgment." (Robert Embry Decl., DE 30-1 at 40). As such, the uncontested facts suggest that Embry's did not assume that the Trustees' case had been resolved, as alleged; but rather, that Embry's knew default judgment was being entered against it and turned a blind eye to the proceedings. *C.K.S. Engineers, Inc. v. White Mountain Gypsum Co.*, 726 F.2d 1202, 1206-1207 (7th Cir. 1984)("[W]here a defaulting party was aware of or should have been aware of its responsibilities to the opposing party and to the court, and failed to live up to those responsibilities through unexcused carelessness or negligence, the default judgment has been left intact.").

Similarly, given Embry's failure to substantively refute that it was aware of default judgment being entered against it, Robert Embry's assertions seem implausible that subsequent settlement negotiations with the Pension Fund, allegedly occurring only a few months after the

entry of default judgment in this case, were somehow related to resolution of the debts Embry's owed in this case.

In sum, Embry's can not establish that its inaction was due to a mistaken understanding that the case had been successfully resolved, either pursuant to Robert Embry's payment or his alleged settlement negotiations with the Pension Fund.

        b. Excusable Neglect

Embry's additionally alleges that it failed to litigate against the Trustees' claims due to excusable neglect. In order to establish excusable neglect, Embry's must establish: (1) that its failure to defend against the Trustees' claims was due to neglect and (2) that Embry's failure to act was excusable. *Zingerman v. Freeman Decorating Co.*, 99 Fed.Appx. 70, 72 (7th Cir. 2004)(unpublished opinion). The Supreme Court has adopted a "flexible understanding" of excusable neglect, which encompasses situations in which the failure to comply with a filing deadline is attributable to ordinary negligence. *Tate*, 305 F.Supp.2d at 919-20 (citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 389 (1993)). *See also Zingerman*, 99 Fed.Appx. at 72 ("neglect exists where the failure to meet a deadline was because of simple, faultless omission to act, or because of carelessness.").

Embry's contends that its failure to act was negligent, based on the same reasons asserted in regards to Embry's alleged mistaken belief. Specifically, Embry's asserts that it failed to defend against the Trustees lawsuit because it mistakenly believed the suit to have been resolved. Accordingly, for the same reasons that this Court concluded Embry's inaction is not attributable to mistake, this Court concludes that Embry's inaction was also not due to negligence.

Further, this Court also finds Embry's unexplained inaction to be inexcusable. In determining whether Embry's inaction is excusable, this Court must take account of "all relevant circumstances" surrounding Embry's inaction. *Zingerman*, 99 Fed.Appx. at 72; *Tate*, 305 F.Supp.2d at 920-21. In particular, this Court must consider: (1) Embry's reason for failure to comply with the Court's deadlines; (2) the impact that Embry's neglect had upon judicial proceedings; (3) whether Embry's acted in good faith; and (4) the danger of prejudice to the Trustees should Embry's neglect be deemed excusable. *Id.*

As to the first factor, this Court notes again that Embry's has failed to offer any explanation for its failure to respond to any of the numerous Court filings that were served upon it, including the motion for default judgment. From the outset, Embry's has failed to proffer any reason that would justify or excuse its inaction. In regards to the second factor, this Court considers Embry's inaction to have at least moderately impaired the legal proceedings. For instance, Embry's inaction necessitated a number of status conferences by the Court. *See e.g.* [DE 14, 18]. Further, Embry's inaction required the Trustees' to take numerous steps to obtain a judgment. However the prejudice that these conferences may have had on the Court's proceedings was exacerbated, in part, by the Trustees' own slow action in advancing their case. *See e.g.* DE 4 (status report ordered by the Court); DE 11 (order to show cause for lack of prosecution).

Third, because Embry's failed to explain why it did not take any action when it received service of the numerous Court filings in this case and because Robert Embry proffered confusion is inconsistent with the well-established facts, the Court cannot conclude that Embry's inaction occurred in good faith. Fourth, the prejudice that the Trustees might suffer if Embry's inaction is

14

excused would be substantial. Persuasive in this regard is Embry's slow action to remedy the default judgment, waiting almost exactly one year after default judgment was entered before moving to vacate the default. Notably, Robert Embry asserts that it did not seek counsel or take steps to reverse this action until the Trustees attempted to collect on the judgment. *See* Robert Embry Decl., DE 30-1 at 5; Embry's Brief, DE 30 at 10. Having waited until the last possible moment to finally object to the Trustees' default judgment, the prejudice to the Trustees, should this Court grant Embry's request to vacate the default judgment, would be substantial. Indeed, after three years of litigation, the Trustees were on the eve of collection before Embry's chose to act in this case.

As such, this Court concludes that Embry's can also not establish that its inaction was due to excusable neglect. Consequently, Embry's has failed to show "good cause" for its inaction.

### 2. *Quick Action to Correct Default*

Even assuming that Embry's could establish mistake or excusable neglect for its inaction, Embry's cannot establish that it took quick action to correct the default judgment. Fed. R. Civ. P. 60(c)(1) provides that a motion for relief from a judgment must be made within a reasonable time," but "no more than a year after the entry of judgment." Fed. R. Civ. P. 60(c)(1). "What constitutes a reasonable time ultimately depends on the facts of each case including the reason for delay, the practical ability of the litigant to have learned about the grounds of the judgment earlier, and the degree of prejudice to the other parties." *Tate*, 305 F.Supp.2d at 923 (internal quotations omitted).

15

The docket supports Embry's assertion that it sought relief from the default judgment after the Trustees acted to collect on the judgment. On February 26, 2010, three days after the Court granted the Trustees' motion for proceeding supplemental and set the matter for hearing on April 2, 2010, counsel for Embry's filed their appearance. Unfortunately, until that time, Embry's appears to have ignored the default judgment entered on February 27, 2009, as the docket also reveals that Embry's waited until the last possible day to seek vacation of the default judgment under the Rule, waiting exactly 364 days after default judgment had been entered against it before moving to vacate. Moreover, it does not appear that Embry's was motivated to act in between these time periods, as two motions for proceeding supplemental were filed on February 17, 2010 and February 23, 2010, without response.

"Courts in this Circuit have held that quick action could not be established when they failed to file a motion to vacate for three months, two months, six weeks, five weeks, or even three weeks." *Tygris Asset Finance, Inc. v. Szollas*, 2010 WL 2610652, *3 (N.D.Ill. 2010)(internal citations omitted). In this case, Embry's seeks to vacate default judgment almost exactly twelve months after default judgment was entered. Embry's has failed to point to any authority in support of his proposition that such a long delay could ever qualify as a "quick action." *See Tygris Asset Finance, Inc.*, 2010 WL 2610652 at *3. Nor can he provide a convincing reason to explain, let alone justify, such a dilatory response. As such, this Court considers Embry's delay in this case to be too protracted to be considered "quick action."

Such a long delay is even more troubling considering the fact that Embry's has failed to offer any explanation why it did not respond to the numerous other filings in this case, made prior to the entry of default judgment and duly served upon Embry's. In contrast, however,

16

Embry's responded very quickly in securing counsel when it learned of the Trustees' attempts to collect on the judgment. Without a credible articulation why Embry's chose not to respond to earlier filings in this case but acted quickly after the Court set a hearing on the second motion for proceedings supplemental filed by the Trustee, the uncontested facts suggest that, instead of quick action *to correct default*, Embry's ignored default judgment but took quick action *to avoid payment*.

Such a long delay, in combination with the absence of a compelling explanation for their conduct, suggests that Embry's inaction was due to willfulness rather than mistake. *C.K.S. Engineers, Inc. v. White Mountain Gypsum Co.*, 726 F.2d 1202, 1205-1206 (7th Cir. 1984)("Where it appears that the defaulting party has willfully chosen not to conduct its litigation with the degree of diligence and expediency prescribed by the trial court, this circuit has repeatedly upheld the trial court's denial of a rule 60(b) motion.").

Finally, this Court additionally considers the prejudice to the Trustees to be substantial, should default judgment against Embry's be vacated. As stated previously, at the time the Trustees moved for default judgment, they had already litigated this case for nearly two years. Further, by the time the Trustees sought collection of the judgment, this case was nearly three years old. Indeed, it was not until that very point, on the eve of collection and just one day before the time period for moving to vacate was set to expire, that Embry's finally took action and moved to vacate the judgment. Allowing Embry's to entirely reset this litigation, three years after it began, without making any prior effort to respond to the numerous filings in this case and without a "good explanation" for its delay in acting, would be unduly prejudicial to the Trustees. *Tygris Asset Finance, Inc.*, 2010 WL 2610652 at *4 ("The reasonableness of a delay

does vary between cases, but to be a reasonable delay [the moving party] ought to have a good explanation."). Consequently, this Court concludes that Embry's has also failed to establish "quick action" to correct the default judgment in this case.

### 3. *Meritorious Defense to the Plaintiff's Complaint*

In addition to showing good cause and prompt action to cure the default, Embry's must also demonstrate that it has a meritorious defense to the Trustees' claims. *Tate*, 305 F.Supp.2d at 924. This does not, however, mean that Embry's must prove that its defense would, beyond a doubt, succeed in defeating the default judgment. *Id*. Instead, Embry's needs only to present a defense that is supported by a legal and factual basis and raises a serious question regarding the propriety of the default judgment. *Id*. *See also* 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2697 (3d ed. 2010) (noting that district courts are afforded great latitude to determine whether a meritorious defense has been successfully asserted).

Embry's raises two defenses in regards to the Trustees' claims against it. First, as has already been discussed, Embry's asserts that the case should have been resolved when Robert Embry made payment in response to the April 2007 letter. Embry's asserts that the Trustees have not made a factual showing regarding delinquent payments to the Health and Welfare Fund and that, therefore, the Trustees have not factually established that Embry's owes anything more to the Health and Welfare Fund. Second, Embry's contends that the amount asserted against it is not an accurate portrayal of what is actually owed. Embry's contends that the amounts claimed as owed to the Health and Welfare Fund is based upon a faulty audit of amounts owed to the separate and unrelated Pension Fund. As such, Embry's argues that the Pension Fund's audit is

not relevant to the determination of the amount owed to the Trustees. Further, Embry's asserts that the audit, upon which the Trustees rely, has been subsequently determined by the Pension Fund to be inaccurately computed, improperly including hours that Embry's employees worked on residential projects. As such, Embry's argues that the amounts asserted against it are severely over-inflated.

In regards to Embry's first asserted defense, this Court has already determined that the clear language of the Trustees' letter required additional payments for January and February 2007 and that Embry's had failed to proffer evidence that it made such payments. As such, this Court does not consider this defense to be meritorious, as Embry's has failed to offer sufficient facts to support it. *Pretzel & Stouffer v. Imperial Adjusters*, 28 F.3d 42, 46 (7th Cir. 1994) (Meritorious defense must be supported by facts and must rise above a general denial and bare legal conclusions).

Relative to their second defense, Embry's claim that the Trustees relied upon a flawed audit, made in relation to the separate and distinct Pension Fund, to establish the amounts owed to the Health and Welfare Fund. Embry's argues that the amount claimed owed by the Trustees in this case is nearly identical to the amounts claimed by the Pension Fund, and based on an audit that was subsequently and significantly revised. However, they have failed to submit evidence that establishes any inaccuracy in the amounts owed to the Health and Welfare Fund, simply asserting, without further explanation, that if the amounts owed to the Pension Fund were in error the same must also be true for the Health and Welfare Fund. Conspicuously absent from Embry's submission is any evidence to demonstrate that the calculation methods for the two funds, or other considerations relevant to the determination of amounts owed, are the same.

In light of the supporting affidavit of Ellen Densborn, the Fund Administrator for the Health and Welfare Fund, proffered by the Trustees in support of its requested judgment award, [DE 21-2], and relied upon by the Court in granting that award, Embry's has failed to sufficiently demonstrate any error in the calculation of the amounts owed under the Health and Welfare Fund. The Court trusts that the Trustees and their legal counsel will not pursue collection of a judgment amount they might at any time have reason to believe is in doubt and urges them to take whatever steps necessary to ensure the accuracy of that amount.

Indeed, even if Embry's could establish a meritorious defense in this regard, they have still failed to show either good cause or quick action to justify that the judgment be set aside. *See C.K.S. Engineers, Inc. v. White Mountain Gypsum Co.*, 726 F.2d 1202, 1208 (7th Cir. 1984) ("[evidence of a meritorious defense] is not enough for [the court] to overturn the district court's decision in the absence of a good excuse for the default.").

### III. Conclusion

Because Embry's has failed to establish good cause for default, quick action to correct the default, or the existence of a meritorious defense to the original complaint, this Court concludes that setting aside the default judgment is not warranted. Accordingly, this Court now **DENIES** Embry's motion to set aside default judgment. [DE 29].

SO ORDERED.

ENTERED:  January 3, 2011

/s/ JON E. DEGUILIO
Judge
United States District Court